Daniel A. Armstrong (# 270175)
darmstrong@afrct.com
Robert A. Bailey (# 214688)
rbailey@afrct.com
ANGLIN, FLEWELLING, RASMUSSEN,
 CAMPBELL & TRYTTEN LLP
199 South Los Robles Avenue, Suite 600
Pasadena, California 91101-2459
Telephone: (626) 535-1900
Facsimile: (626) 577-7764

R. Isaak Hurst, Esq.
 isaak.hurst@internationalmaritime.net
International Maritime Group, PLLC
601 Union Street, Suite 4200
Seattle, Washington 98101
Telephone: (206) 992-0710
Fax: (206) 707-8338

Attorneys for Plaintiff
Tri-Union Frozen Products, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| TRI-UNION FROZEN PRODUCTS, INC., a corporation,<br><br>         Plaintiff,<br><br>   v.<br><br>TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a corporation,<br><br>         Defendant. | Docket No.:  2:14-cv-8128<br><br>**COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT;**<br><br>**2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**3. DECLARATORY RELIEF** |

Plaintiff TRI-UNION FROZEN PRODUCTS, INC., a corporation ("Tri-Union" or the "Insured") alleges as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction of the subject matter under 28 U.S.C. §1332(a)(1) because the controversy is between citizens of different states and involves more than $75,000.00 exclusive of interests and costs. The plaintiff is a citizen of California and is incorporated under the laws of Delaware with its principal place of business in California. The defendant is a citizen of Connecticut and is incorporated under the laws of Connecticut, with its principal place of business in Connecticut.

2. Venue is proper in the Western Division of the Central District of California because the Crime Policy was made, delivered, performed, paid, and the obligation arises, in the County of Los Angeles.

## NATURE OF ACTION

3. On December 19, 2013, a cybercriminal "hacked" into corporate email communications between Tri-Union and its foreign supplier and fraudulently caused the transfer of $258,171.36 into a Japanese bank account. The money subsequently disappeared. This is a covered loss under Tri-Union's crime insurance policy, issued by the defendant, Travelers Casualty and Surety Company of America ("Travelers" or the "Insurer"). Travelers, however, wrongfully refuses to compensate Tri-Union for this covered loss, asserting patently-incorrect pretexts for the denial. Tri-Union is now compelled to enforce its rights under the insurance policy.

## PARTIES

4. The Insured, Tri-Union Frozen Products, Inc., is a company organized under the laws of Delaware and licensed to do business in the State of California, with its principal place of business at 222 N. Sepulveda Blvd #1550, El Segundo, CA 90245.

5. The Insurer, Travelers Casualty and Surety Company of America, is an insurance company organized under the laws of Connecticut with its principal

place of business in One Tower Square, Harford, Connecticut 06183. Travelers is an insurance company authorized to do and doing business as a liability insurer in the State of California, including in the County of Los Angeles.

## FACTUAL BACKGROUND

6. **The Policy.** On May 09, 2013, Tri-Union purchased, and Travelers issued, the "Wrap+ Crime Policy", No. 105614491 (the "Crime Policy"). A true and correct copy of the Crime Policy is attached as Exhibit A to this complaint and incorporated herein by reference. The Crime Policy provides, in part, that Travelers will pay Tri-Union for any direct loss of, or direct loss from damage to, Money, Securities and other property caused by "Forgery or Alteration," "Computer Fraud" and "Funds Transfer Fraud" that Tri-Union sustains during the policy period. The Crime Policy took effect on May 09, 2013, and was still in effect on December 19, 2013, the date of the loss described in the following paragraphs.

7. The Crime Policy provides, as set forth below:

   i. The "Forgery or Alteration" Insuring Agreement provides:

   "**B. FORGERY OR ALTERATION**

   The Company will: pay the **Insured** for the **Insured's** direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

   a. made by, drawn by, or drawn upon, the **Insured**, or purport to have been so made or drawn; or

   b. made or drawn by one acting as the **Insured's** agent, or purport to have been so made or drawn...."

   ii. "**Forgery**" is defined in Section III. Z. as "the signing of the name of another person or organization with a handwritten signature physically affixed directly to a **Covered Instrument** or **Covered Personal Instrument**, without authority and with the intent to

deceive; it does not mean a signature that consists in whole or in part of one's own name signed with or without authority in any capacity, for any purpose."

    iii. **"Covered Instruments"** is defined in Section III K as "1. checks, drafts, promissory notes, bills of exchange or similar written promises, orders or directions to pay a sum certain in Money..."

    iv. The "Computer Crime" Insuring Agreement provides:

"**F. COMPUTER CRIME**

1. Computer Fraud

The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Computer Fraud**."

    v. **"Computer Fraud"** is defined in Section III E as "The use of any computer to fraudulently cause a transfer of **Money, Securities** or **Other Property** from inside the **Premises** or **Financial Institution Premises**: 1. to a person (other than a Messenger) outside the **Premises** or **Financial Institution Premises**; or 2. to a place outside the **Premises** or **Financial Institution Premises**."

    vi. The "Funds Transfer Fraud" Insuring Agreement provides:

"**G. FUNDS TRANSFER FRAUD**

The Company will pay the **Insured** for the **Insured's** direct loss of **Money** and **Securities** contained in the **Insured's Transfer Account** directly caused by **Funds Transfer Fraud**.

    vii. **"Funds Transfer Fraud"** is defined in Section III AA as "2. a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a **Financial Institution** directing

such **Financial Institution** to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the **Insured** but was in fact fraudulently issued, **Forged** or altered by someone other than the **Insured** without the **Insured's** knowledge or consent;…

8. <u>The Loss</u>. Tri-Union was the victim of a sophisticated Computer Fraud and Funds Transfer Fraud attack involving fraudulent emails and Forged documents that resulted in the unlawful taking of Tri-Union's money in the amount of $258,141.36. The details of the fraud are as follows:

   a. Starting in June of 2013, Tri-Union communicated with one of its suppliers Dongshan Huachang Foodstuff, Co., Ltd., ("Dongshan") via email at a legitimate email address ("Dongshan's Email Address"). During the course of those communications, Dongshan informed Tri-Union that it had a new subsidiary, and requested that Tri-Union add a new payee to its purchase orders. Dongshan informed Tri-Union that all wire payments would have to go to this new payee in the future.

   b. Tri-Union submitted a purchase order to Dongshan in August of 2013 and multiple emails were exchanged over the subsequent four months addressing the details of production, inspection and shipment of two containers of Dongshan's product.

   c. On December 10, 2013 Dongshan provided shipping documentation to Tri-Union and requested payment. The following day, Dongshan instructed Tri-Union to split its payment on the purchase order to two separate accounts, with part-payment going

        to an account in Huachang, China, and the remainder going to a new account in Singapore.

d. Up through this point, all communications had been legitimate communications with Dongshan and all instructions from Dongshan were authentic.

e. On information and belief, on or around December 17, 2013 a Cybercriminal hacked the legitimate email account of Dongshan, taking control of the account unbeknownst to either Dongshan or Tri-Union.

f. Over the course of the next 30 days, the Cybercriminal conducted an elaborate and carefully crafted campaign to manipulate both Dongshan and Tri-Union. By hijacking the Dongshan email account and creating a false email account resembling that of Tri-Union, the Cybercriminal was able to pose as Tri-Union in communications with Dongshan, and pose as Dongshan in communications with Tri-Union.

g. First, the Cybercriminal reconfigured the settings of the hacked Dongshan email account, causing all emails from Tri-Union to be transferred to a folder entitled "deleted." Henceforth, all communications from Tri-Union to Dongshan during this 30 day period were intercepted by the Cybercriminal and unnoticed by Dongshan. Instead, the Cybercriminal created another email account designed to resemble that of Tri-Union, and communicated with Dongshan through this email account falsely posing as Tri-Union.

h. On December 17, 2013 the Cybercriminal emailed Tri-Union from the hacked account, posing as Dongshan, revising the instruction from December 11, and requesting that the second part-payment be

sent to an account in Japan, rather than the account in Singapore. The email attached appropriate supporting documents, including a forged letterhead and forged corporate seal. Given the recent history regarding the new subsidiary and new account, and the fact that the instruction came from Dongshan's Email Address, Tri-Union had no reason to suspect that the December 17, 2013 email was fraudulent.

i. Meanwhile, the Cyberciminal strung Dongshan along with a series of excuses for the delay in payment. Using the fraudulently created email account, the Cybercriminal sent multiple emails to Dongshan, posing as Tri-Union's Inbound Logistics Administrator, Ezra Zakoo and ensuring the supplier that payment would be made on the purchase order. The Cybercriminal used this email account to dispel any concern of Dongshan's regarding delays in part-payment, which Dongshan expected in its Singapore account. The Cybercriminal bought time and assuaged Dongshan's concerns over the next 30 days by sending multiple emails claiming delays in payment. The Cybercriminal's nefarious ruse included claims that the payment was accidentally delayed by a missing "s" in the wiring instructions, and that Mr. Zakoo was out on holiday. On January 8, 2013 the Cybercriminal sent Dongshan a forged bank document, showing anticipated release of funds to the Singapore account.

j. All the while, the Cybercriminal simultaneously communicated with Tri-Union from the hacked email account of Dongshan and continued to re-route the emails from Tri-Union into the "deleted" folder. On December 19, 2013—believing the Japanese account to be genuine—Tri-Union's Inbound Logistics Administrator, Ezra

Zakoo, emailed Dongshan informing them that the payments to the accounts in China and Japan would be made the following day.

k. The same day, Tri-Union received an email from its bank, Bank of America, regarding the wire transfer. The email requested confirmation that the wire transaction "was indeed authorized" by Tri-Union. Tri-Union confirmed that it had requested the wire transfer.

l. On December 30, the Cybercriminal emailed Tri-Union's Inbound Logistics Administrator from the Dongshan Email Address informing him that the payment to the account in Japan had not been made. This was followed by an email on January 7 requesting an update on the payment to the account in Japan.

m. Tri-Union's Inbound Logistics Administrator responded the same day, noting that the payment was made to the account in Japan. The logistics administrator also sent an email including a payment confirmation from Bank of America showing payment to the account in Japan.

n. The Cybercriminal then modified the Bank of America payment confirmation to make it appear as though the payment had been made to the Singapore account. On January 8, 2014 the Cybercriminal emailed the forged and falsified Bank of America payment confirmation to Dongshan.

o. On January 14, Dongshan emailed the Cybercriminal (at the fraudulently created email address) inquiring as to why payment had not been received in the Singapore account.

p. The Cybercriminal responded to Dongshan's inquiry the following day, claiming he would look into the issue, in order to buy more time to withdraw the funds from the account in Japan.

      q. On January 22, 2014 the fraud was revealed when Dongshan's representative called Tri-Union's Inbound Logistics Administrator, Ezra Zakoo, to ask for payment and Mr. Zakoo informed Dongshan that the payment had been made to the account in Japan.

9. Upon discovering the fraud, Tri-Union immediately contacted all the applicable parties in an effort to retrieve the missing funds, to no avail. The transfer of $258,141.36 from Tri-Union's Bank of America account into the fraudulent Japanese bank account could not be recovered. Consequently, Dongshan, one of Tri-Union's key Asian suppliers, is seeking payment for the outstanding amounts owed by Tri-Union.

10. **The Adjustment of Tri-Union's Claim**. On March 3, 2014, Tri-Union submitted a Proof of Loss with supporting documents to Travelers. Tri-Union notified Travelers of the hacking and subsequent loss of monies and demanded that Travelers indemnify its loss, pursuant to the indemnity provisions of the Crime Policy, Claim Number 083-BF1-T1401334-NR (the "Claim"). Travelers assigned the adjustment of the Claim to its Claims Executive, Melissa Manning. On July 17, 2014, Ms. Manning sent a letter to Mr. Ibarra of Tri-Union denying the Claim.

11. On August 20, 2014, counsel for Tri-Union submitted a request for reconsideration to Ms. Manning outlining multiple flaws in the July 17, 2014 denial letter. Ms. Manning responded on September 15, 2014 with an affirmation of the denial of coverage and additional pretexts for the denial.

12. Tri-Union is informed and believes and thereon alleges that Travelers failed to conduct a prompt full and complete investigation of the facts and circumstances giving rise to the Claim. Travelers failed and refused to:

      a. Conduct a prompt, full and complete investigation of the Claim. Manning, in breach of Travelers' duty to adjust Tri-Union's claim in good faith and to investigate every available source of

information, set out to collect the minimum facts necessary to support a denial of the claim based on a defense that the claim was excluded from Policy coverage, and Manning failed to interview witnesses or review all documents in the possession of Tri-Union. If Manning had conducted a competent investigation, she would have received information showing that Travelers had no right to deny Tri-Union's claim and that Tri-Union's claim was indeed not excluded under the Policy.

    b. Advise Tri-Union in a timely manner regarding the status of the Claim and of its need for additional time to respond to the Claim.

    c. Promptly respond to communications with respect to the Claim.

13. Had Travelers conducted a reasonable investigation of the Claim, they would have learned, *inter alia*, the facts alleged in paragraph 8(a)-(p) above. Those facts, and the information available to Travelers revealed:

    a. That the Cybercriminal's acts amounted to "Forgery or Alteration" under Section I. B. of the Crime Policy's coverage in that the instruction for payment forged by the Cybercriminal and submitted on December 17, 2013 attached appropriate supporting documents, including a false letterhead and forged corporate seal and constituted a "Covered Instrument" under Section III. K. of the policy.

    b. That the history of communications preceding the fraud lasted for several months and included notification by Dongshan of a new subsidiary and a legitimate request from Dongshan that the payment for the purchase order be split between two legitimate accounts. Travelers would have discovered that this history created a reasonable belief on the part of Tri-Union's Inbound Logistics Administrator that the request to change the part-payment account

was legitimate and the request directly caused the loss asserted in the Claim.

c. That the extent of the fraud was elaborate and carefully-crafted, including a broad array of deceptive tactics, each of which necessarily involved the use of a computer to fraudulently cause the transfer of money, thus falling squarely under the definition of "Computer Fraud" and covered under the "Computer Crime" insuring agreement.

d. That the Cybercriminal posed as Tri-Union's Inbound Logistics Administrator in email communications to Dongshan for 30 days in order to assuage Dongshan's concerns regarding the delay in payment, thereby masking the discovery of the fraud—an essential element in the scheme—and ensuring that the payment was fraudulently issued, constituting additional computer fraud and funds transfer fraud.

e. That the Cybercriminal modified the Bank of America payment confirmation through the use of a computer to make it appear as though the payment had been made to the Singapore account, constituting additional computer fraud and funds transfer fraud.

14. Tri-Union has performed all of its obligations under the Crime Policy, except for those obligations which it has been excused or prevented from performing because of Travelers' breach of its obligations.

15. **Tri-Union's harm**. As a result of Travelers' bad faith handling of Tri-Union's claim and failure to pay the claim, Tri-Union was deprived of the $258,141.36 due under its Crime Policy and is suffering an ongoing loss of business confidence from one of its key suppliers. Tri-Union has also been required to retain attorneys to prosecute its rightful Claim. Tri-Union has suffered general damages in an amount to be proved at trial.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

### (AS AGAINST DEFENDANT TRAVELERS)

16. Plaintiff incorporates into this paragraph the allegations set forth in paragraphs 1-15 as if they were set forth in full in this paragraph.

17. Tri-Union paid all premiums due under the policy, submitted all proofs of loss required under the policy, and performed all other conditions the policy required it to perform.

18. Travelers breached their obligations under the Crime Policy in the following manner:

   a. By failing to cover the loss asserted in the Claim.

   b. By asserting pretexts to deny the Claim with patently incorrect interpretations of the terms of the Crime Policy—as more fully alleged by example in paragraph 23 below.

   c. By delaying in making any determination under all potentially applicable insuring agreements.

   d. By failing to address coverage under the "Forgery or Alteration" Insuring Agreement in Section I. B. of the Crime Policy in its July 17, 2014 denial and its September 15, 2014 affirmation of denial.

   e. By failing to conduct a prompt and complete investigation into the facts and circumstances giving rise to the Claim and by doing each of the acts or omissions alleged in paragraph 13.

19. As a result of the failure and refusal of Travelers to conduct an investigation, it is estopped from relying on any subsequently discovered information to support its rejection of Tri-Union's Claim.

20. As a result of the failure and refusal of Travelers, it is deemed to have waived any obligation on the part of Tri-Union to cooperate with it in the investigation of the Claim.

21. As a result of Travelers' breach of this policy, Tri-Union has suffered

harm as alleged in paragraph 15 above. Therefore, Tri-Union seeks judgment as prayed for below.

### SECOND CAUSE OF ACTION: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(AS AGAINST DEFENDANT TRAVELERS)

22.     Plaintiff incorporates into this paragraph the allegations set forth in paragraphs 1 through 21 as if they were set forth in full in this paragraph.

23.     In adjusting Tri-Union's claim, Travelers, through its agent, Manning, breached the implied covenant of good faith and fair dealing by unreasonably denying the Claim without having any reasonable grounds for doing so. Travelers knew that it had no reasonable grounds for denying the claim and acted in reckless disregard of that fact. This lack of reasonable grounds for denying the claim is evident in the affirmation of denial from September 15, 2014. Therein, Travelers asserted pretexts as justification for the denials of the Claim with patently-incorrect interpretations of the terms of the Crime Policy. For example, Travelers contended that Tri-Union's claimed loss was "not directly caused by **Computer Fraud**." Travelers contended that "**Computer Fraud** could not directly cause a loss unless the perpetrator, at a minimum, hacked into an insured's **Computer System**, or the **Computer System** of the insured's financial institution." But as Travelers is well-aware, the definition of **Computer Fraud** makes no mention of the term "**Computer System**." Travelers is also well-aware that the loss was "directly caused by **Computer Fraud**" because the definition of "**Computer Fraud**" in section III. E. of the Crime Policy requires only the *"use of a computer to fraudulently cause a transfer of Money."* By asserting this specious justification for denial, Travelers knowingly and maliciously misrepresented the terms of Crime Policy in an effort to wrongfully deny the Claim.

24.     Travelers further acted in reckless disregard of Tri-Union's rights under the Crime Policy in that:

    a. Travelers unreasonably performed an inadequate investigation of the Claim as alleged in paragraphs 12 and 13.

    b. Even after determining that Tri-Union had a right to the insurance proceeds it claimed, Travelers denied Tri-Union of its policy proceeds for the purpose of coercing Tri-Union to accept full financial responsibility for this loss.

    c. By delaying and denying Tri-Union's claim, defendant Travelers, knowing that it had no legal justification for doing so, forced Tri-Union to hire attorneys and file this Complaint in order to obtain the reimbursement to which it is entitled.

    d. Manning, in order to delay and deny payment of Tri-Union's claim, purposefully used an overbroad interpretation of the Policy's exclusions, knowing that this interpretation was contrary to case authority in the State of California.

    e. In the course of adjusting Tri-Union's claim, Manning waited until Tri-Union's relationship with its supplier was on the verge of imploding before sending a denial letter. Manning engaged in this conduct for the purpose of taking advantage of Tri-Union's vulnerable position in the hope of inducing it to accept full responsibly for this loss.

25. Travelers' refusal to carry out its obligations under the Crime Policy was done with a conscious disregard of the rights of Tri-Union to receive the benefits due. Travelers made misrepresentations of the Crime Policy to Tri-Union with the intention of depriving Tri-Union of the policy proceeds. These acts were done with the knowledge and approval and ratification of Travelers and continued even after Tri-Union raised its concerns in its request for reconsideration.

26. As a result of Travelers' breach of the Policy, Tri-Union has suffered harm as alleged in paragraph 15 above.  Therefore, Tri-Union seeks judgment as

prayed for below.

### THIRD CAUSE OF ACTION: DECLARATORY RELIEF

#### (AS AGAINST DEFENDANT TRAVELERS)

27. Plaintiff incorporates into this paragraph the allegations set forth in paragraphs 1-15 as if they were set forth in full in this paragraph.

28. As set forth above, an actual controversy exists relating to the legal rights of the Insured and the duties of the Insurer under the Crime Policy.

29. Tri-Union seeks a declaration by the Court that the Crime Policy covers its Claim, that the Insuring Agreements B, F, and G of that policy cover the loss resulting from the facts described in paragraphs 8(a)-(p) of this complaint, and that the exclusions in the Crime Policy are inapplicable to the Claim or are otherwise unenforceable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For $258,141.36 in policy proceeds;
2. For prejudgment interest at 10% per annum;
3. For an order declaring that the Crime Policy covers Tri-Union's Claim.
4. For attorney's fees and costs, according to proof;
5. For punitive damages;
6. For general damages, according to proof;
7. For such further relief as the Court may deem just.

Respectfully submitted,

Dated: October 15, 2014

ANGLIN, FLEWELLING, RASMUSSEN, CAMPBELL & TRYTTEN LLP

By: _____
Daniel A. Armstrong
Attorneys for Plaintiff
Tri-Union Frozen Products, Inc.